**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GUARDIAN ALARM COMPANY OF
MICHIGAN, and GUARDIAN MEDICAL
MONITORING, INC., a Michigan Corporation,

       Plaintiffs,                        CASE NO. 06-CV-13721

-vs-                                          PAUL D. BORMAN
                                            UNITED STATES DISTRICT JUDGE

JEFFREY S. PROUGH, a Michigan resident,
Individually, and CRITICAL SIGNALS
TECHNOLOGIES, INC., a Michigan Corporation,

       Defendants.

_____/

**OPINION AND ORDER**
**DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Before the Court is Plaintiffs' August 22, 2006 Ex Parte Motion for a Preliminary Injunction and Temporary Restraining Order to enjoin Defendants' (1) violation of his covenant not to compete and (2) further infringement upon Plaintiffs' trademark. (Docket No. 3). The Court held a hearing on Plaintiffs' Ex Parte Motion on August 22, 2006. Defendants filed their Response in Opposition on September 1, 2006. (Docket No. 10). Defendants filed a Supplemental Brief in Response to Plaintiff's Motion on September 29, 2006. (Docket No. 15). The Court held an evidentiary hearing on Plaintiffs' motion on October 4, 2006. Defendants filed their Supplemental Brief on October 11, 2006. (Docket No. 24). Plaintiffs filed their Supplemental Brief on October 11, 2006. (Docket No. 25).

1

**I.     BACKGROUND**

    **A.     Procedural**

On August 30, 2006, Guardian Alarm Co. and Guardian Medical Monitoring Co. ("Plaintiffs") filed their Amended Complaint against their former president Jeffrey S. Prough and his company Critical Signals Technologies ("CST") ("Defendants"). (Docket No. 9). Plaintiffs essentially allege that their former president, Prough, has appropriated Plaintiffs' registered trademark for CST, violated his covenant not to compete with Plaintiffs, breached his fiduciary duties to Plaintiffs, and converted Plaintiffs' property. The Amended Complaint contains the following allegations:

    Count I:     Trademark Infringement (federal and state law)
    Count II:    Unfair Competition (federal and state law)
    Count III:   Dilution (state and federal law)
    Count IV:   Violation of Covenant not to Compete (state law)
    Count V:    Violation of Non Solicitation (state law)
    Count VI:   Breach of Fiduciary Duty (state law)
    Count VII:  Conversion (state law)
    Count VIII: Claim & Delivery (state law)

Before the Court is Plaintiffs' August 22, 2006 Ex Parte Motion for a Preliminary Injunction, principally regarding the Count IV claim of the violation of the covenant not to compete. (Docket No. 3). The Court held a hearing on Plaintiffs' Ex Parte Motion on August 22, 2006. Defendants filed their Response in Opposition on September 1, 2006. (Docket No. 10).

The parties entered into a Stipulation on September 11, 2006, that included *inter alia* the following until October 4, 2006. (Docket No. 13).

    (1)    Defendants' employees or agents would not contact any of Plaintiffs' current customers;
    (2)    Defendants' employee or agents would not solicit or accept any of Plaintiffs' current employees;
    (3)    Defendants would not appropriate any of Plaintiffs' intellectual property;

>   (4)   Defendants would withdraw from the Ohio Association of Area Agencies on Aging Trade show in September 2006 and would withdraw any of their advertising already submitted.

Defendants filed a Supplemental Brief in Response to Plaintiffs' Motion on September 29, 2006. (Docket No. 15). The Court held an evidentiary hearing on Plaintiffs' motion on October 4, 2006. After the hearing, the parties agreed to maintain their previous stipulation for two weeks until October 18, 2006. The Court additionally requested that the parties submit supplemental briefs addressing the single legal issue of whether a plaintiff can maintain an action for a defendant's violation of a non-compete agreement in the absence of the signed agreement itself. In other words, whether there can be a non-compete understanding between the parties based upon a defendant's statements or conduct.

Defendants filed their Supplemental Brief on October 11, 2006. (Docket No. 24). Plaintiffs filed their Supplemental Brief on October 11, 2006. (Docket No. 25).

For the following reasons, the Court **DENIES** Plaintiffs' request for a preliminary injunction as to the issues involving the covenant not to compete.

   **B.   Plaintiffs' Factual Allegations and Arguments**

       1.   *Non-Compete Agreement*

Defendant Prough was employed as president of both Guardian Alarm Company of Michigan ("GAM") and Guardian Medical Monitoring Company ("GMM") from March 9, 1994, until his involuntary termination on October 4, 2005. Plaintiffs contend that Defendant signed a non-compete agreement at some point in the first few years after his hire.

Plaintiffs cannot produce a signed non-compete agreement. Plaintiffs have not offered any evidence that any Guardian employee told Defendant that he had to sign a non-compete agreement, actually observed Defendant sign the agreement, or ever saw a copy of his signed

3

agreement. Instead, Plaintiffs rely upon (1) the testimony of several Guardian employees that they overheard Defendant make statements that he had signed the non-compete agreement, and (2) the fact that Defendant was in exclusive possession of his personnel file from some point in the late 1990s until the commencement of the present litigation. That file, when provided to Plaintiffs, did not contain a signed non-compete agreement.

Defendant maintains that he never signed a non-compete agreement. Additionally, Defendant argues that although he retained exclusive possession of his personnel file in his office during his employment at Guardian, he did not take the file with him when he was terminated; the file was inadvertently sent to his residence by Guardian with other personal effects after his termination. Defendant finally responds that he never saw or removed a non-compete agreement from his file while in possession of it.

Plaintiffs first offered the testimony of Gisela Foreman, Guardian's director of human resources. She had served in this position for eighteen (18) years and prior to Defendant's hiring by Guardian. She testified that the human resources department possessed all of the employees' personnel files. (Tr. p. 26-27).[1] In order to view a personnel file, a manager would have to check out the file using a card to record the manager's name and date the file was checked out. (Tr. p. 27-28). In conjunction with Foreman's testimony, Plaintiffs offered a card for Defendant's personnel file checked out to "J. Prough" on "12/21." (Tr. p. 28-29; Pl's Ex. 1). Plaintiff later made a stipulated offer of proof that Foreman would testify that she believed that year to be "1998." (Tr. p. 111-12). Foreman then stated that she became aware that Defendant was maintaining possession of his own personnel file, contrary to company policy. (Tr. p. 30). Foreman confronted Defendant with this fact, but Defendant told her that he needed the file for

---

[1] The citations to the transcript are from the hearing that took place before the Court on October 4, 2006.

4

"litigation" and would return it to the human resources department. (Tr. p. 31). Foreman recalled that this conversation occurred probably in 1997 or 1998. (Tr. p. 31). She did not see the file again until it was produced by Defendant for this current litigation. (Tr. 31-32).

Foreman averred that it was company policy to have employees sign a non-compete agreement. (Tr. p. 32-33). At one point during Defendant's tenure as president of Guardian, a sales representative resigned from the company, and Foreman realized that the representative's file did not contain a signed covenant not to compete. (Tr. p. 34). Foreman then informed Defendant of this, and Defendant became upset and directed the human resources department to find out which employees had not signed a non-compete. (Tr. 34). Foreman prepared a list and presented it to Defendant. (Tr. p. 35-36; Pl's Ex. 3). Defendant's name was not on the list that Foreman provided to Defendant. Defendant then asked Foreman to take steps to get people to sign the non-compete agreement. (Tr. p. 36). Defendant then stated in the presence of other employees, "I signed the non-compete. Everyone else in this company would sign the non-compete." (Tr. p. 36). Foreman testified that she heard Defendant make statements to this effect "a few times." (Tr. p. 37).

Foreman admitted that she had no personal knowledge that Defendant ever signed a non-compete agreement, and had never seen a copy of a non-compete agreement signed by Defendant. (Tr. p. 41). Indeed, none of Plaintiffs' witnesses have ever seen a copy of a non-compete agreement signed by Defendant. Foreman testified that although she had packed up Defendant's effects from his office after his termination, she did not include any Guardian files in those materials. (Tr. p. 41). Foreman testified that Janet Martin was also involved in the packing of the boxes. (Tr. p. 42).

5

Plaintiffs next introduced the testimony of Laurie Mickiewicz, Guardian's director of finance. Mickiewicz also stated that in the context of the aforementioned sale representative's failure to sign a non-compete agreement, she heard Defendant state that since he had signed such an agreement, everyone at the company also had to sign one. (Tr. p. 43-45). She remembered a particular occasion when Defendant made a statement to that effect while Robert Craig, in-house counsel for Guardian, was in the room. (Tr. p. 45). Mickiewicz admitted that she had no personal knowledge of Defendant signing a non-compete agreement and never saw a copy of an actual document. (Tr. p. 51-52).

Corporate Counsel Robert Craig testified that on one occasion Defendant became angry at a staff meeting in regards to the sale representative who did not sign the non-compete agreement and said, "I signed one. Everybody's got to sign one." (Tr. p. 53-54).

Upon Defendant's termination from Guardian on October 4, 2005, Craig asked Foreman to produce Defendant's personnel file. (Tr. p. 55). Craig then learned that Defendant was still in possession of his personnel file. (Tr. p. 55-56). Craig met with Defendant and requested that Defendant return his personnel file, but Defendant never did. (Tr. p. 57). Craig did not see the personnel file until counsel for Defendant turned it over to Guardian during this present litigation. (Tr. p. 57-58). Craig also admitted that he had no personal knowledge of a specific Prough-signed non-compete agreement and did not ever see a signed agreement. (Tr. p. 63).

Finally, Plaintiffs introduced the testimony of Karen Majeske, Guardian's Michigan Alarm general manager. Majeske also recalled the incident involving the sales representative. She stated that in the context of that incident Defendant said, "I expect everyone to sign one. I signed one, and every employee at Guardian will sign one from me on down." (Tr. p. 71).

Defendant denied signing a non-compete. Defendant testified that he negotiated his terms of employment as president of Guardian directly with Guardian's owners Douglas and Richard Pierce. (Tr. p. 74; Def's Ex. A). Defendant stated that the Pierces did not discuss the issue of a non-compete agreement in the context of his employment negotiations. (Tr. 75). Defendant asserted that all matters relating to his employment went through the Pierces. (Tr. p. 76). Further, Defendant testified that he was not required to fill out the packet of usual employment forms that was required of other Guardian employees. (Tr. p. 76). Defendant did not recall any incident where he informed fellow employees that he signed a non-compete agreement, but "might have as an enticement to get everybody motivated to sign them." (Tr. p. 82).

Upon the termination of his employment, Defendant claimed that when he left his office he only took his keys, cell phone, and wallet, but not any files. (Tr. p. 83). Defendant admitted that he had possession of his own personnel file in his office for at least five years prior to his termination in October 2005. (Tr. p. 84, 97). Defendant stated that he was unaware that Guardian had included his personnel file in the white office file boxes of his personal effects delivered to his garage. (Tr. p. 84-85, 99-100, 103).

Defendant additionally testified that he never made any verbal non-compete agreement with Plaintiffs at any time during his employment or upon his termination. (Tr. p. 85).

Furthermore, Defendant testified that after his termination, in May 2006, he met with the Pierces and informed them of his plans to start a medical monitoring business, and the Pierces made no mention of any non-compete agreement that would prevent him from establishing such a business. (Tr. p. 86-87).

Plaintiffs and Defendants made a stipulated offer of proof that Richard Pierce would have testified that that there was never an agreement between Pierce and the Defendant that Defendant

7

would be exempted from the general policy that all employees sign covenants not to compete. The stipulation further included that Pierce would testify that Guardian Medical Monitoring was never offered for sale to Defendant. (Tr. p. 108-09). Again, the Court notes that neither of the Pierces testified at the hearing. Thus there was no testimony that in negotiating Defendant's employment, the owners of Guardian informed him of the requirement that he sign a non-compete. Nor was there testimony that when Defendant spoke with the Pierces in the Spring of 2006 about setting up Defendant's new medical monitoring business, that they told him that could not because of a non-compete agreement.

        2.    *Trademark Infringement*

Plaintiffs allege that Defendants have misappropriated their validly-registered federal trademark "Virtually There Care." Plaintiffs claim that they first started using the mark "Virtually There Care" on February 11, 2004. Plaintiffs have also produced as an exhibit a presumably-valid registration from the United States Patent and Trademark Office from July 19, 2005. Plaintiffs have been continuously using the mark from February 2004 to the present on all associated literature, advertisements, and displays. Plaintiffs contend that Defendants have misappropriated the mark "Virtually There Care" on Defendant's advertising services. Plaintiffs have additionally submitted one such example. (Pl. Compl. Ex. B).

Defendants have, in effect, stipulated to a single use misappropriation of Plaintiffs' trademark

## II.   ANALYSIS

###    A.   Standard for Issuing a Preliminary Injunction

The Sixth Circuit has held that this Court must make "specific findings of fact" on the following four factors in order to grant a preliminary injunction:

>    (1)   The likelihood that the movant will be successful on the merits;
>    (2)   Whether the movant will suffer irreparable harm without the injunction;
>    (3)   The probability that granting the injunction will cause substantial harm to others; and
>    (4)   Whether the public interest will be advanced by issuing the injunction.

*Six Clinics Holding Corp. v. Capcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997). For the purposes of a motion for a preliminary injunction, the Court's findings of fact and conclusions of law are not conclusive for later proceedings. *Vittitow v. City of Upper Arlington*, 43 F.3d 1100, 1107-08 (6th Cir. 1995).

       1.    *Likelihood of Success on the Merits*

As to this issue, the Court finds that based on the evidence presented thus far, the Plaintiffs have not proved a likelihood of success on the merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by the court granting a preliminary injunction are not binding at a trial on the merits").

Michigan law recognizes the validity of an express non-compete clause in an employment contract as long as it is "reasonable as to its duration, geographical area, and type of employment or line of business." MICH COMP. LAWS ANN. § 445.774a(1); *see St. Clair Med., P.C. v. Borgiel*, 270 Mich. App. 260, 265-66 (2006). Furthermore, a non-compete clause must protect a legitimate business interest of the party seeking its enforcement. *Lowry Computer Prods., Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997).

Plaintiffs cite *Thermatool Corp. v. Borzym*, 227 Mich. App. 366 (1998), for the proposition that, under Michigan law, courts can an issue an injunction to extend the protection of a non-compete clause beyond the agreed period. In *Thermatool*, the court held that "[i]n cases where a party has flouted the terms of a noncompetition agreement, the court should be able to fashion appropriate equitable relief. . . ." *Id*. at 375.

The burden to prove the existence of a non-compete contract is on the plaintiff. *Kamalnath v. Mercy Memorial Hosp. Corp.*, 194 Mich. App. 543, 548-49 (1992). There is a substantial factual dispute as to whether Defendant Prough ever signed a non-compete clause with Guardian.

          a.        Credibility of the Evidence

Plaintiffs cite the federal district court case *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405 (N.D. Iowa 1996), where the court granted a preliminary injunction to the plaintiff corporation even though the defendant denied that he had ever signed a non-compete agreement. In *O'Rourke*, the defendant was hired as the production manager for a company specializing in producing refrigerated bagels for sale in supermarkets. In his position, the defendant was privy to the company's best-kept trade secrets. *Id.* at 1416. Less than two years later, the defendant accepted employment at a competing bagel company. *Id.* at 1420. The plaintiff filed a motion for a preliminary injunction to enjoin the defendant's violation of a non-competition agreement and the defendant's misappropriation of the plaintiff's trade secrets. *Id.* at 1410.

The defendant argued that he had never seen, never signed, and never required any employee that he had hired to sign a non-competition agreement with the plaintiff corporation. *Id.* at 1417. Furthermore, the plaintiff could not produce a signed copy of the defendant's alleged non-competition agreement. *Id.* at 1416-17. The defendant further claimed that he never signed any employment contract and that he only received a letter from the Chairman and CEO stating the terms of his employment. *Id.* at 1417-18.

The plaintiff could not offer the testimony of anyone at the company that ever saw the defendant's alleged signed non-compete agreement. *The plaintiff did, however, offer testimony that on the defendant's first day, the CEO of the company and the CEO's father witnessed the*

10

*defendant sign the non-compete agreement in their presence*. *Id*. at 1417. The CEO's father then countersigned the document; and the CEO delivered the executed non-compete agreement to a desk in the reception area, yet the employee at the desk was gone for the day. *Id*. The plaintiff further averred that the defendant had the motive and opportunity to remove the agreement from his personnel file when he decided to take other employment. *Id*. Although the defendant insisted that he never signed an agreement, he did admit that he was aware of the corporation's extensive confidentiality agreements. *Id*. The plaintiff further introduced the fact that all new employees had to sign a "packet of forms" that included the non-compete agreement and that out of 160 files only two did not include the non-compete agreement. *Id*. at 1415. Finally, the plaintiff offered evidence that the defendant made explicit assurances to the CEO and his father after the defendant's resignation that he would not be going to work for a competitor. *Id*. at 1419.

The defendant's personnel file containing those forms did not include the non-compete agreement. *Id*. at 1418.

The court ultimately concluded:

> Here, the court has identified as a critical credibility determination that must be made by the trier of fact whether [the defendant] signed the non-competition agreement. Plainly, a jury or trier of fact could go either way on the question, and therefore [the plaintiff's] success is at least . . . . sufficiently likely to support the kind of relief it requests . . . [T]here is substantial evidence that everyone at [the plaintiff's business] was aware of and signed [non-compete agreements], down to the lowest level employees. The court has difficulty believing that the one person a company would most likely to see bound by such an agreement, its plant manager, was simply overlooked, although admittedly it is not beyond the realm of possibility.

*Id*. at 1433. (internal citations and quotations omitted).

The Court reads the holding in *O'Rourke* for the proposition that the Court can find that a non-compete agreement can form the basis of a preliminary injunction, even when the existence

11

of the agreement is in dispute, if the Court finds the evidence sufficient to find that the plaintiffs have a "reasonable likelihood of success on the merits."

On its face, *O'Rourke* presents a very similar factual situation to the present case. The plaintiff in *O'Rourke* introduced substantial evidence that the company had a strong interest in making its employees sign its non-compete agreement given its interest in safeguarding proprietary information and processes. Furthermore, the plaintiff showed that the defendant had the incentive and the opportunity to tamper with his employment file.

In contrast, however, there was testimony in *O'Rourke* that the CEO's father actually witnessed the defendant's signing of the document; nothing of this significance is present in the instant case. Furthermore, there is no evidence that like the defendant in *O'Rourke* that Defendant made any assurances to Guardian after his termination that he would not compete.

        b.        Equitable Estoppel

Plaintiffs next argue that the Court should apply equitable estoppel to bar Defendant from denying the existence of the non-compete agreement. Plaintiffs contend that Defendant's statements to several co-employees that he had signed the non-compete clause would estop Defendant from denying the agreement's existence.

Under Michigan law, "[e]quitable estoppel arises where a party, by representations, admissions or silence, intentionally or negligently induces another party to believe facts, and the other party justifiably relies and acts on this belief, and will be prejudiced if the first party is permitted to deny the existence of the facts." *Conel Dev., Inc. v. River Rouge Savings Bank*, 84 Mich. App. 415, 422-23 (1978). Equitable estoppel "is not a cause of action unto itself; it is available only as a defense." *Van v. Zahorik*, 227 Mich. App. 90, 102 (1997). The doctrine is "generally available as protection from a defense raised by a defendant, but it has never been

recognized as a cause of action in itself." *Lathrup Inv. Co. v. West American Ins. Co.*, No. 212269, 2000 WL 33391105, *1 (Mich. Ct. App. Dec. 15, 2000) (unpublished) (citing *Hoye v. Westfield Ins. Co.*, 194 Mich. App. 696, 705-07 (1992)).

  Plaintiffs argue that whether or not the Court believes the testimony of Defendant, it can find that Plaintiffs relied upon the statements made by Defendant in front of co-workers that he signed the non-compete agreement. Plaintiffs further contend that they relied upon these statements to their detriment. However, Defendants argue that there is no evidence in the record that Plaintiffs relied upon Defendant's statements. (Def. Supp. Br. p. 17)

  In *Barilla America, Inc. v. Wright*, No. 4-02-90267, 2002 WL 31165069 (S.D. Iowa July 5, 2002) (unpublished), the defendant was hired by the plaintiff corporation as its new plant manager. *Id*. at *1. When the defendant began his employment, he was given a packet of documents containing company policies and procedures, a confidentiality and non-compete agreement, the employee handbook, benefits overview, federal and state tax forms, as well as other information. *Id*. at *2. The human resources manager instructed the defendant that he was required to sign the forms therein. *Id*. Shortly after beginning work at the company, a human resources manager came into the defendant's office with copies of some of the documents in the employment packet, but not the confidentiality or non-compete agreement. *Id*. The human resources manager informed the defendant that he still needed to sign the rest of the forms in his initial packet, and the defendant confirmed that he was aware of that fact. *Id*. The court further found that plaintiff corporation went to great pains to protect its facilities and processes. *Id*. The defendant then resigned his position five months later. *Id*. at *3.

  The plaintiff then brought suit against the defendant to enforce the confidentiality and non-compete agreements. The plaintiff argued that the defendant should be equitably estopped

13

because (1) he gave assurances that he would sign the agreement and (2) he was silent when he had a duty to speak. *Id*. at *6.

The court found that the defendant did not make any kind of representation or assurance that he would sign the confidentiality or non-compete agreements. *Id.* The agreement was not mentioned at the defendant's job interview and was not mentioned in the defendant's offer letter. *Id*. Moreover, the human resources manager did not bring that form to him to sign when she brought the copies of the other forms. *Id*. The defendant made no explicit assurances to the managers that he would sign the agreement. *Id*. Finally the court found that the plaintiff corporation did not reasonably rely upon the defendant's assurances:

> However, the record shows that employees have slipped through the cracks and did not sign the necessary agreements. In fact, [the plaintiff] has a semiannual audit procedure to confirm every employee has signed the appropriate documents. [The plaintiff] is clearly the more sophisticated party with plans and procedures in place to protect its proprietary information.

*Id*. at *7. Therefore, the court found that the plaintiff did not reasonably rely on any statements or assurances made by the defendant and refused to apply equitable estoppel.

In the present case, as in *Barilla*, Guardian had a strong incentive to ensure that Defendant signed the non-compete agreement. Furthermore, it is reasonable for a corporation that has a policy of having all of its employees sign non-compete agreements to have its company president do the same. Plaintiffs do not specifically demonstrate how they relied upon Defendant's oral representations that he signed the contract. In fact, there was testimony that when certain employees refused to sign a non-compete, the policy was not enforced. (Prough, Tr. p. 81). This does not provide strong enough support for Plaintiffs' asserting equitable estoppel against Defendant's defense of non-existence of the contract.

                c.        Spoliation of the Evidence

Plaintiffs argue that the Court should apply a spoliation rule since there is evidence that, against company policy, Defendant had possession of his personnel file for at least five years and did not turn it over to Plaintiffs until well after his termination, indeed, until after the initiation of this lawsuit.

A threshold question is whether the Court should apply federal or state law to a claim of spoliation. *Joostberns v. United Parcel Serv.*, 166 Fed. Appx. 783, 796 (6th Cir. 2006) (unpublished). In this case, the application of either law would lead to the same result. Under federal law, an "adverse inference from spoliation, while not entirely dependent on bad faith, is based on the spoliator's mental state." *Id*. at 797. (citation omitted). "Where the spoliator has no notice of pending litigation, the destruction of evidence does not point to consciousness of a weak case." *Id*.

Under Michigan law, missing evidence "gives rise to an adverse presumption only when the complaining party can establish intentional conduct indicating fraud and a desire to destroy [evidence] and thereby suppress the truth." *Ward v. Cons. Rail Corp*., 472 Mich. 77, 84 (2005) (internal quotations omitted). Furthermore, if the defendant can come forward with rebuttal evidence that provides a non-fraudulent explanation for the missing evidence, there is no adverse presumption. *Id*. at 85; *see* M. Civ. JI 6.01(c). "Once the defendant present[s] this evidence, the initial presumption dissolve[s] and, at best, the fact-finder [is] left with the possibility of considering the underlying influences." *Ward*, 472 Mich. at 85.

Defendant testified that he had, in violation of company procedure, checked his personnel file from the human resources department and kept his personnel file in his office in perpetuity, i.e. for many years. He further testified that the file was shipped to him by Plaintiffs in sealed boxes at some point after his termination, but that he never opened the boxes until this litigation.

15

After this case began, he looked into the boxes found the personnel file, which he subsequently delivered to his attorney for the purposes of this litigation. Defendant further claimed that he did not remove anything from the file. Defendant has offered no reason for his improper taking control over his personnel file, in perpetuity.

The Court finds that Plaintiffs, however, have presented no evidence that anyone told Defendant that he was required to sign such an agreement, that anyone saw him sign an agreement, or that anyone saw a signed agreement. Indeed, no one testified that anyone at Guardian ever provided him with a blank agreement. This factor is in neither side's favor with regard to this preliminary injunction decision.

2.      *Irreparable Injury*

To show that Plaintiffs are entitled to a preliminary injunction, they must show that they would suffer "irreparable injury." Harms are not irreparable if they are "fully compensable by money damages." *Basic Computer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). "The injury must be certain and great, and it must be actual rather than theoretical." *Thermatool Corp.*, 227 Mich. App. at 338-39. In the context of non-compete agreements, the Sixth Circuit has found that "loss of customer goodwill" and a "loss of fair competition" are both likely to harm irreparably an employer. *Basic Computer*, 973 F.2d at 512.

Plaintiffs have claimed that Defendants' activities cause it irreparable injury because Prough is violating the terms of his non-compete agreement because he set up CTS during the period covered by the agreement. Plaintiffs have also established that Defendant, in violation of his non-compete agreement, has recruited Guardian employees possessing specialized knowledge of the company's information technology systems and access to customer lists.

16

It is undisputed that Defendant has been in the process of setting up CTS, searching for possible investors, and maintaining a company website, all within the period covered by the alleged non-compete agreement. Under *Basic Computer*, the harms alleged by Plaintiff are sufficiently difficult to quantify and thus satisfy the "irreparable injury" prong for granting a preliminary injunction if there is a non-compete agreement. However, the Court, at this stage, concludes that the Plaintiffs have not met their burden of proof as to the existence of the non-compete agreement.

    3.    *Harm to the Public or Others*

Plaintiffs have not alleged that granting a preliminary injunction in this instance will prevent any harm to the public or to others.

**III.   CONCLUSION**

The Court **DENIES** Plaintiff's motion for a preliminary injunction.

**SO ORDERED.**

                s/Paul D. Borman
                PAUL D. BORMAN
                UNITED STATES DISTRICT JUDGE

Dated: October 19, 2006

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on October 19, 2006.

                s/Denise Goodine
                Case Manager